FILED
11/09/2017
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 10, 2017 Session

## STATE OF TENNESSEE v. BRANDON LEE CLYMER

**Appeal from the Criminal Court for Davidson County**
**No. 2015-A-314    Steve R. Dozier, Judge**

_____

### No. M2016-01124-CCA-R3-CD

_____

The Defendant, Brandon Lee Clymer, was convicted of rape of a child by a Davidson County Criminal Court jury. He is serving a twenty-six-year, Range II sentence. On appeal, he contends that: (1) the evidence is insufficient to support his conviction, (2) the trial court erred in admitting evidence of the victim's forensic interview, (3) the trial court erred in admitting the Defendant's pretrial statement without redacting opinions expressed by police officers, (4) the trial court erred in overruling the Defendant's objection to the State's rebuttal closing argument, (5) he is entitled to a new trial due to cumulative trial error, and (6) the trial court imposed an unconstitutional and excessive sentence. We affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. NORMA MCGEE OGLE, J., concurred in the results.

Dawn Deaner, District Public Defender; Jeffrey A. Devasher (on appeal), Georgia Simms (at trial), and Kevin Griffith (at trial), Assistant District Public Defenders; for the appellant, Brandon Lee Clymer.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn R. Funk, District Attorney General; Chad Butler, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's conviction relates to the December 2013 digital-vaginal penetration of the then-six-year-old victim. The Defendant was a family friend at the time of the offense.

At the trial, the victim testified that her birthdate was July 25, 2007. She said that two years earlier, in 2014, the Defendant "digged in" her "pee pee." She identified her pee pee as her private area. She said the incident occurred next to the computer in the kitchen of her aunt's house. She said she had been standing and playing games on the computer. She said that she wore a dress and that the Defendant touched her skin. She did not recall how long the incident lasted or how it ended. She said that she told her mother, her aunt, and her uncle what happened. The victim said her mother called the police. The victim did not know if she talked to the police but said she was interviewed by "Ms. Lillie" at the Nashville Children's Alliance. She said that before she came to court, she watched a video recording of her interview.

The video recording of the victim's January 10, 2014 interview was played for the jury. It reflects the following: The victim lived with her mother, aunt, and two cousins. The victim pointed to parts of her body that were "private places," and she identified them on a drawing. She identified them as "nipple," "pee pee," and "butt." She said "Brandon" touched her pee pee more than once on one date. She said the touchings occurred while she used a computer in the kitchen and while she watched "Panda Bears Christmas." She said that he touched her pee pee on her skin and clothes and that he touched her pee pee inside and outside. When asked how it felt when Brandon touched the inside of her pee pee, the victim stated it felt like "nothing." When asked how it felt when he touched the outside of her pee pee, the victim stated, "It feeled [sic] like he wasn't touching me." The victim stated that the incident at the computer occurred first, that Brandon sat in a chair, that he put one of her legs on a chair as she stood, that Brandon did not speak, that she wore a dress and panties, and that he moved her panties and "started digging in" her pee pee. She said it felt like Brandon was not doing anything. When asked what digging meant, the victim stated, "It means you're digging in the dirt looking for stuff." She said he moved his hand from side to side. When asked if she had said Brandon's fingers went inside her, she said, "Mmm hmm," and nodded. When shown a drawing and asked if he put his fingers inside the hole, she said he did not. When shown the drawing and asked if he put his fingers "inside the two parts over here," the victim nodded affirmatively. The victim added that the Defendant touched "the line on your pee pee" and was "swinging that around." She said three people were in the living room and another person was upstairs. The victim said that Brandon stopped when her mother walked in and that her mother did not see anything.

In the recorded statement, the victim said that the second incident occurred as she and Brandon lay on the bed in the room she and her mother shared. The victim said that others were in the living room and that her brother was in the bedroom lying on the bed with Brandon and her. She said Brandon put her under the covers. The victim said, "He did this," and made a motion with her hand, but what she demonstrated is not visible on the recording. She made a motion with her hand a second time, the details of which are not visible on the recording, and the interviewer asked if Brandon stuck his hand in the victim's pants. The victim responded by making a motion, which again is not visible on the recording, and stated, "Just like this." When the interviewer asked if the victim meant the back of her pants, the victim nodded. When asked how this felt, the victim responded with a statement that is unintelligible on the recording. The victim said the Defendant did not touch her pee pee and agreed that he touched around the back of her pants. When asked to clarify if she meant he touched around the top part of her pants or her butt, the victim stated he touched her skin at the top part of her pants. She said he did not speak during the incident. The victim stated that Brandon did not do anything to himself and that he remained clothed during the incidents. She said Brandon's actions made her feel "weird." The victim stated that no one other than Brandon had ever touched her inappropriately. The victim stated that after Brandon left, she told her mother what happened and that her mother told other family members. The victim first said the incidents occurred after Christmas but then said she thought it was "about to be Christmas."

The victim testified that she remembered everything and that her recorded statement was true. She agreed that the statement had been given two years earlier and that she had been six years old when the incident occurred. She agreed the Defendant touched her twice: once when she was at the computer and once when she was upstairs watching "Panda Christmas." She said the incident at the computer occurred first. When asked to reenact how she had demonstrated in the interview that the Defendant had touched her, she said she did not remember. She agreed that she said in the interview that the Defendant touched the outside and the inside of her pee pee. When asked to demonstrate where the Defendant's finger had been relative to "outside" and "inside," she stated that she could not remember.

The victim testified that she understood the importance of telling the truth and that she was truthful in her testimony. She identified the Defendant in the courtroom. The victim said that the Defendant was her uncle's friend, that she and her mother lived with her aunt and uncle for one to two months, and that the Defendant visited at their house.

During cross-examination, defense counsel drew a diagram of the home in which the incidents occurred based upon the victim's descriptions. She agreed that her mother, two grandmothers, an aunt, an uncle, her brother, and two cousins had been at the house on the date of the incidents. The victim said the Defendant's visiting the house was normal.

The victim agreed that the only time the Defendant touched her pee pee was when she stood at the computer. She agreed that the adults, other than the Defendant, watched a movie in the living room and that she was not home alone with the Defendant when this occurred. She said that she was never home alone with the Defendant that day and that she had never been home alone with him. She agreed that the Defendant touched her skin but that his finger did not go inside the hole on her pee pee. She agreed that her mother walked in the kitchen and that her mother did not see what the Defendant had done to her. She said that the Defendant touched her a second time in the kitchen and that she told her mother after the second time.

The victim agreed that the Defendant did not touch her pee pee in the bedroom. She agreed that her brother was in the bedroom with the Defendant and her when the Defendant touched her on her back. She said he did not touch her between her legs.

The victim agreed that she knew it was important to tell her mother what happened. She said at first that she did not think her mother had talked to her about what to do if an adult touched her inappropriately, but she later conceded her mother might have. The victim said that after she told her mother, her mother told her aunt and uncle about what happened. The victim said her aunt talked to her about what happened. She agreed that she heard her whole family discussing the matter and that it was upsetting. The victim said her mother called the police quickly. She did not remember talking to Officer Earle or other officers. She remembered talking to Ms. Lillie, the interviewer on the video recording, but she did not remember talking to Ms. Tamika on the day of the recorded interview or at her school. She agreed that she talked to Ms. Lillie shortly after the incidents and that the incidents occurred when "it was about to be Christmas."

The victim testified that she did not know whether she had talked to her mother, her uncle, and her aunt after her interview with Ms. Lillie. The victim did not know whether she had seen a doctor or a counselor since the interview. She said she had watched the recording of the interview the previous day in Ms. Tamika's office but said she did not know Ms. Tamika. She agreed that watching the recording helped her remember things.

The victim's mother testified that she, the victim, and the victim's brother moved to Tennessee in 2013. The victim's mother said they moved into the home of her sister, her sister's husband, and her two nieces.

The victim's mother identified the Defendant. She said the Defendant and her sister's husband had been best friends in 2013. She described the Defendant as being "like a family member."

The victim's mother testified that on December 21, 2013, everyone was home and that the Defendant arrived around 11:00 a.m. or noon. She thought he arrived while she and her sister were away from the home running errands. The victim's mother said she and her sister returned around 4:00 to 5:00 p.m. She later said they might have returned around 3:00 p.m. She said she would disagree if a police report said they were only gone from about 1:00 to 1:15 p.m. She did not recall telling a detective that the Defendant had been present when she left and that she asked the Defendant to watch the victim. She said she "would never say that" and stated that her sister's husband watched the children. The victim's mother said that her mother and grandmother arrived while she was away and that they stayed until 6:00 or 7:00 p.m. She said the adults socialized, ate pizza, and watched a movie in the living room, and the children played, ate pizza, and watched a movie upstairs. She said the Defendant and her sister's husband went upstairs to take pizza to the children, that her sister's husband returned first, and that the Defendant did not return for another fifteen to twenty minutes. She said the Defendant was the only adult upstairs during this time. She said that after the Defendant returned, the adults socialized and that the victim came downstairs to use a computer in the kitchen. The victim's mother stated that as she went outside to smoke, the victim asked to speak to her. The victim's mother said that she could tell the matter was serious by the look on the victim's face, that the victim told her the Defendant had touched the victim's pee pee and felt the victim's butt, and that the victim's mother got her sister and had the victim repeat her statement to the victim's mother's sister. The victim's mother said that her sister got her sister's husband, that they had the victim repeat her account to the sister's husband, and that the sister's husband asked the Defendant to leave without giving the Defendant an explanation. The victim's mother said the Defendant left quietly, which was unusual because he was normally argumentative and confrontational. She said that she called the police and that they arrived after the Defendant's departure.

The victim's mother testified that before December 21, 2013, she had told her children not to talk to strangers and to run away if a stranger tried to talk to them. She said she told them to tell her if someone touched them in a way that made them feel uncomfortable. She agreed that she was a single mother and that she was protective of her children, in part, because she had been sexually abused as a child. She said she had

never spoken to her children, either before or after December 21, 2013, about the sexual abuse she suffered.

The victim's mother testified that she had not seen the Defendant since December 21, 2013. She said this was unusual because until that date, he came to her sister's house daily and that her sister was annoyed by the frequency of his visits.

The victim's mother testified that a detective came to the house and talked to "us," although she said the detective did not talk to the victim. The victim's mother said she told the detective that the victim had been sexually abused, although she did not recall if she told the detective about multiple instances of abuse. She was unsure if the victim had revealed the extent of the abuse to her at this point. She did not recall if the police told her family to avoid further contact with the Defendant. The victim's mother said that during the course of the investigation, a succession of detectives was assigned to the case and that she talked to several detectives. She said she spoke with Department of Children's Services (DCS) employee Tamika Drennan but did not recall telling Ms. Drennan that she did not think a medical examination was necessary because the victim had not been penetrated. The victim's mother said the victim met with DCS personnel "[a]t the forensic interview." The victim's mother agreed that the victim had met with the forensic interviewer, the prosecutors, and a victim/witness coordinator and that the victim had been to court "a few times." The victim's mother said the victim had not attended therapy.

The victim's mother did not recall if she told Detective Mike Bennett that the Defendant had been upstairs alone with the children for about fifteen minutes. She said she met with Ms. Drennan once and did not recall if she told Ms. Drennan that the Defendant had been alone with the children. The victim's mother said she saw the victim and the Defendant in the kitchen together on December 21, 2013. She said she saw the victim straddling the Defendant's knee when the victim and the Defendant were in the kitchen at the computer and did not recall if she reported this to a detective or a DCS employee. The victim's mother said she never had a real opportunity to talk to anyone and said that when she did speak with a detective, they merely asked her questions. She said she thought she had done what she was supposed to do. She agreed that she did not see the Defendant touch the victim's vagina.

The victim's uncle testified that on December 21, 2013, he lived with his wife and his children. He said that the victim's mother, the victim, and the victim's brother were living with them temporarily and that his mother-in-law and his wife's grandmother were visiting on that date. The victim's uncle did not recall if his brother was at the home on December 21. The victim's uncle identified the Defendant, whom he said was "basically

a brother to us." The victim's uncle said his sister and the Defendant's cousin were married. The victim's uncle said that he and the Defendant would "hang out sometimes for days on end" and that on December 21, they were very close. The victim's uncle said that the Defendant and everyone in the victim's uncle's household were close and that they loved and trusted the Defendant.

The victim's uncle testified that on December 21, 2013, his wife and the victim's mother left for most of the day, returning around 3:00 to 4:00 p.m. He said he and the Defendant "hung out" and played a video game. The victim's uncle said the Defendant was at the house most of the day, and the victim's uncle did not recall if the Defendant had stayed overnight the previous evening. The victim's uncle said that at one point, the Defendant cared for the children when the victim's uncle went to a store. The victim's uncle said that during the early evening, the Defendant had been in the kitchen using the victim's uncle's computer. The victim's uncle said that after his wife and the victim's mother returned, "We were mostly hanging out watching a movie," and that the Defendant was in the kitchen with the victim "hanging out on the computer." The victim's uncle said the Defendant seemed attached to the children, especially the victim, that evening, which was unusual behavior for the Defendant. The victim's uncle said that he and the Defendant went upstairs together to take pizza to the children. The victim's uncle noted that at another time, the Defendant went upstairs to check on the children and lay in bed and watched a movie with them. The victim's uncle stated that at one point, he was upstairs and saw the Defendant lying in bed with the victim and one of the victim's uncle's daughters. The victim's uncle said that he asked the Defendant when the Defendant was going to come downstairs to socialize with the adults and that the Defendant responded, "I'll be down there in a little while." The victim's uncle said the Defendant returned downstairs at some point.

The victim's uncle testified that at one point on the evening of December 21, 2013, his wife asked him to come outside. The victim's uncle said the victim's mother told him that the Defendant had touched the victim inappropriately. The victim's uncle said that he went inside, that he heard the bathroom sink running, that he saw the Defendant coming out of a bathroom drying the Defendant's hands on the Defendant's pants, and that the victim's uncle brought the victim outside. The victim's uncle said that he asked the victim what happened and that she told him. The victim's uncle said he returned to the living room and asked the Defendant to leave because they had family business to which they needed to attend. The victim's uncle said the Defendant stated, "[T]hat's okay, I will see you later." The victim's uncle said the Defendant's reaction was unusual because the Defendant could be "nosey." The victim's uncle said that he did not tell the Defendant about the sexual abuse allegations and that the Defendant did not inquire. The victim's uncle said that he had not heard from the Defendant since

December 21, 2013, and that this was unusual because they had been close. The victim's uncle identified a photograph of his home, which he agreed was a duplex with his living area being about 1120 square feet.

The victim's uncle did not recall if he told a detective about the Defendant's unusual attachment to the victim on December 21, 2013. The victim's uncle also did not recall if he told an investigator about seeing the Defendant in bed with the victim.

The victim's uncle testified that he was "very close" to his sister's husband, who was the Defendant's cousin. The victim's uncle said he called his sister's husband on the night the allegations arose. He agreed that he spoke with a detective and a DCS employee about the allegations. He also agreed that he did not see the Defendant touch the victim.

Lillie Kennedy, a forensic interviewer and an employee of Nashville Children's Alliance, testified that she interviewed the victim. Ms. Kennedy stated that she had received specialized training to be a neutral party in interviewing children and that she was not a member of law enforcement. She said, however, the Nashville Children's Alliance was a member of the Child Protective Investigation Team (CPIT) and acknowledged that the police department, DCS, and district attorney general's office were involved with CPIT. She said the training she received for conducting forensic interviews was not a method that was typically utilized by law enforcement. She agreed that based upon her interview of the victim, she prepared a report, which she submitted to her supervisor and the other members of CPIT. She acknowledged that on the "forensic interview disclosure information guide" she completed as part of her report, she selected the type of contact the victim reported as "fondling," not "digital penetration."

Ms. Kennedy testified that she began an interview of a suspected child sexual abuse victim by building rapport with the child and that she asked neutral questions before transitioning to inquiries about anatomy identification and touch. She said that this typically led to the child making a disclosure and that she asked follow-up questions. She said that she used open-ended questions initially but asked more direct questions to clarify what the child said. She agreed that responses to leading questions could yield less reliable information than open-ended questions and that when she asked more direct questions, she was focused on specific details provided by the child. She said she ended an interview when the child appeared to have given all the information the child had. She said that she typically received a DCS referral and sometimes had a police report before conducting an interview. She thought she had only a DCS referral before she interviewed the victim. Ms. Kennedy stated that she tried to limit conversation with a child's family members to an introduction before an interview. She said that although only she and a

child were in a room during an interview, other members of CPIT observed the interview. She said a child's friends and relatives were not allowed to participate. She said that forensic interviews were recorded in order to avoid the child's having to discuss the allegations repeatedly and that the child's family was not given a copy of the recording.

Ms. Kennedy testified that she had conducted approximately 677 forensic interviews in her career. She said she had an undergraduate degree in communication studies and a minor in psychology. She attended twelve hours of continuing education annually, and in the previous year, she attended an additional symposium. She said that when she interviewed the victim in 2014, she had been in Nashville for two months. She said that before she began working in Nashville, she had worked for one and one-half years as a part-time forensic interviewer in Dickson County, although she had other employment between the Dickson County job and the Nashville job.

A portion of the victim's recorded interview was played. Ms. Kennedy testified with regard to a drawing seen in the recording on which the victim circled body parts and that Ms. Kennedy labeled them with the names the victim used for the parts. Ms. Kennedy agreed that when she discussed the drawing with the victim, she asked the victim if the Defendant's finger "went inside her hole" and that the victim said, "no." Ms. Kennedy thought that the victim had said the Defendant's finger went inside "the line" and that Ms. Kennedy had asked if the victim meant inside the "two parts." Ms. Kennedy said that Ms. Kennedy had referred to a line on the drawing representing the vaginal lips.

Metro Nashville Police Detective Elizabeth Mills testified that she was assigned to the Defendant's case, although two other detectives had handled the case before her. She said that she and Detective Nathan Smith located the Defendant at a relative's house and interviewed the Defendant. An audio recording of the August 1, 2014 interview was played for the jury. In the interview, the Defendant stated the following: He was aware the victim's mother had called the police because the victim said the Defendant touched the victim. He first heard about the allegations in January of an unspecified year. Someone left a handwritten message at the Defendant's grandfather's house, but the Defendant did not call the number in the message. The Defendant knew the victim's mother from going to his "cousin-in-law's house and hanging out." The Defendant said he had been left alone a few times with the victim and the cousin-in-law's children. He said he was not a sexual predator and that he had been upset and thought the allegations were offensive. He recalled an occasion on which he was at his cousin-in-law's house and had been drinking and watching a movie, although he could not recall the date. He thought that at some point, he had been upstairs on the bed watching a movie with the victim and another child. He said that his cousin-in-law asked him to leave, that he heard

arguments in the back of the house, that arguments were not unusual in the house, and that he did not "think anything of it." He said he had no indication why he was asked to leave. He said that about one month later, he mentioned to "Josh" that the police had looked for the Defendant at his place of employment. He then learned about the victim's allegations. The Defendant did not know why the victim would make the allegations and said that if he had touched the victim's vaginal area, it had to have been accidental. He said, "Obviously something happened that was misconstrued." He said the victim sometimes straddled his knee and that when he was tired of having her sit there but she did not want to move, he would "unclench her." He said the victim was a "huggy, touchy child" who liked to be around people. He said that he might have picked up the victim and touched her between her legs but that he was merely playing with the victim. He said he had spent the night at the house where the victim lived but that he had never dressed any of the children who lived there.

Detective Mills testified that the Defendant had been nervous and defensive during the interview. She said that she did not collect rape kit evidence due to the passage of time between the offense and her taking over the case. She noted, as well, that at the time of the offense, "touch DNA" evidence was not widely known and used. She agreed that the Defendant never admitted he had intentionally touched the victim.

Metro Nashville Police Officer Adam Earle was called as a defense witness and testified that based upon police records, he was dispatched on the evening of December 21, 2013, to an address that other evidence showed was the victim's residence. He had no independent recollection of the call. Based upon his report, however, he testified that he spoke with the victim's mother. He said that he did not speak to the victim and that standard operating procedure provided that he not speak to child witnesses. He said it was possible that adults other than the victim's mother had been present and that they may have provided information. Based upon the report, he stated that the victim's mother told him she had left the Defendant at the house briefly while she was away from about 1:00 to 1:15 p.m. Officer Earle did not think the victim's mother identified any other individuals she left in the Defendant's care. Officer Earle agreed that the victim's mother reported the victim's having stated after the victim's mother returned home that the Defendant had moved the victim's panties and touched the victim. Officer Earle said that if the victim's mother had stated that more than one incident occurred, he would have noted it in his report. He said that if the victim's mother had said the Defendant and the victim had been alone more than once, Officer Earle would have noted it in his report. He said he had classified the incident as "forcible fondling" but did not know if he had changed the classification at some point. Officer Earle said that his role had been to take a report and that follow-up would be done by detectives at a later date. He said he arrived at the residence at approximately 8:19 p.m. and that he completed the report at

approximately 11:32 p.m.  He said he might have been involved with other calls between the call at the victim's house and his completing the report.  He acknowledged the possibility that he had received information that was not reflected in his report and agreed that his narrative in the report consisted of four sentences.

After receiving the evidence, the jury found the Defendant guilty of rape of a child.  This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction because the State failed to show the element of penetration.  The State responds that the proof is sufficient.  We agree with the State.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age."  T.C.A. § 39-13-522(a) (2014).  Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body,

but emission of semen is not required[.]"  T.C.A. § 39-13-501(7) (2014).  Our supreme court has held that it is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient." *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001) (quoting *Hart v. State*, 21 S.W.3d 901, 905 (Tenn. 2000)).

Viewed in the light most favorable to the State, the evidence reflects that the victim testified about an incident when she used the computer in her aunt's kitchen and the Defendant "digged in" her "pee pee," which she identified as her private area.  In the forensic interview, the victim explained relative to the term digging, "It means you're digging in the dirt looking for stuff."  She also stated in the forensic interview that the Defendant's fingers had gone inside her but had not gone in the "hole" and that he moved his hand from side to side.  When the victim was shown the drawing by the forensic interviewer and asked if he put his fingers "inside the two parts over here," the victim nodded affirmatively.  The victim also told the forensic interviewer that the Defendant touched "the line on your pee pee" and was "swinging that around."

The Defendant argues that the State failed to prove the penetration element of rape of a child because the victim told the forensic interviewer that the Defendant's finger did not go inside her, that she could not recall at the trial whether his finger went inside her, and that both the forensic interviewer and Officer Earle categorized the incident reported to them as involving "fondling."  As we have noted, the victim stated that the Defendant touched her private area but that his finger did not go inside her "hole."  Her description of his having put his fingers inside the two parts, touching the line on her pee pee and swinging it around, "digging," and moving his hand from side to side, combined with the drawing utilized in the forensic interview which was received as a trial exhibit, established penetration, in the legal sense, of the victim's vulva or labia. *See id.*  The evidence is sufficient, and the Defendant is not entitled to relief on this basis.

## II

### Admission of Evidence of the Victim's Forensic Interview

The Defendant contends that the trial court erred in admitting evidence of the victim's forensic interview because Ms. Kennedy, who conducted the interview, was not a qualified forensic interviewer pursuant to Tennessee Code Annotated section 24-7-123(b)(3) because her work experience did not fulfill the statutory criteria.  The State counters that the court did not err in admitting the evidence because Ms. Kennedy was a qualified forensic interviewer pursuant to the statutory criteria and that, in any event, any error in the admission of the forensic interview was harmless in view of the victim's

testimony about the offense. We conclude that the trial court did not abuse its discretion in admitting the recorded forensic interview.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence lies within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)); *see State v. Justin Tyler*, No. W2015-00161-CCA-R3-CD, 2016 WL 1756419, at *5 (Tenn. Crim. App. Apr. 29, 2016) (applying abuse of discretion standard of review to question of admissibility of recording of a forensic interview).

Tennessee Code Annotated section 24-7-123 prescribes the criteria for admission of forensic interviews of suspected child sexual abuse victims. The statute provides, essentially, a limited exception to the rule against the admission of hearsay evidence. *State v. McCoy*, 459 S.W.3d 1, 10 (Tenn. 2014). Pursuant to the statute:

> (a) Notwithstanding any provision of this part to the contrary, a video recording of an interview of a child by a forensic interviewer containing a statement made by the child under thirteen (13) years of age describing any act of sexual contact performed with or on the child by another is admissible and may be considered for its bearing on any matter to which it is relevant in evidence at the trial of the person for any offense arising from the sexual contact if the requirements of this section are met.

> (b) A video recording may be admitted as provided in subsection (a) if:

> (1) The child testifies, under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and the child is available for cross examination;

> (2) The video recording is shown to the reasonable satisfaction of the court, in a hearing conducted pre-trial, to possess particularized guarantees of trustworthiness. In determining whether a statement possesses particularized guarantees of trustworthiness, the court shall consider the following factors:

(A) The mental and physical age and maturity of the child;

(B) Any apparent motive the child may have to falsify or distort the event, including, but not limited to, bias or coercion;

(C) The timing of the child's statement;

(D) The nature and duration of the alleged abuse;

(E) Whether the child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience;

(F) Whether the statement is spontaneous or directly responsive to questions;

(G) Whether the manner in which the interview was conducted was reliable, including, but not limited to, the absence of any leading questions;

(H) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement;

(I) The relationship of the child to the offender;

(J) Whether the equipment that was used to make the video recording was capable of making an accurate recording; and

(K) Any other factor deemed appropriate by the court;

(3) The interview was conducted by a forensic interviewer who met the following qualifications at the time the video recording was made, as determined by the court:

(A) Was employed by a child advocacy center that meets the requirements of § 9-4-213(a) or (b); provided, however, that an interview shall not be inadmissible solely because the interviewer is employed by a child advocacy center that:

(i) Is not a nonprofit corporation, if the child advocacy center is accredited by a nationally recognized accrediting agency; or

(ii) Employs an executive director who does not meet the criteria of § 9-4-213(a)(2), if the executive director is supervised by a publicly elected official;

(B) Had graduated from an accredited college or university with a bachelor's degree in a field related to social service, education, criminal justice, nursing, psychology or other similar profession;

(C) Had experience equivalent to three (3) years of fulltime professional work in one (1) or a combination of the following areas:

(i) Child protective services;

(ii) Criminal justice;

(iii) Clinical evaluation;

(iv) Counseling; or

(v) Forensic interviewing or other comparable work with children;

(D) Had completed a minimum of forty (40) hours of forensic training in interviewing traumatized children and fifteen (15) hours of continuing education annually;

(E) Had completed a minimum of eight (8) hours of interviewing under the supervision of a qualified forensic interviewer of children;

(F) Had knowledge of child development through coursework, professional training or experience;

(G) Had no criminal history as determined through a criminal records background check; and

(H) Had actively participated in peer review;

(4) The recording is both visual and oral and is recorded on film or videotape or by other similar audio-visual means;

(5) The entire interview of the child was recorded on the video recording and the video recording is unaltered and accurately reflects the interview of the child; and

(6) Every voice heard on the video recording is properly identified as determined by the court.

(c) The video recording admitted pursuant to this section shall be discoverable pursuant to the Tennessee rules of criminal procedure.

(d) The court shall make specific findings of fact, on the record, as to the basis for its ruling under this section.

(e) The court shall enter a protective order to restrict the video recording used pursuant to this section from further disclosure or dissemination. The video recording shall not become a public record in any legal proceeding. The court shall order the video recording be sealed and preserved following the conclusion of the criminal proceeding.

T.C.A. § 24-7-123 (Supp. 2016).

The Defendant argues that Ms. Kennedy did not have three years' full-time professional work in the areas specified by subsection (b)(3)(C) of the statute. The trial court conducted a pretrial hearing regarding the admissibility of the recording of the forensic interview. Ms. Kennedy's testimony at the pretrial hearing, her resume received as an exhibit at the pretrial hearing, and her trial testimony established the following: She graduated from college in July 2010 and began her career with the Twenty-Third Judicial District's Child Advocacy Center in September 2010, where she remained until May 2012. She began her employment in the Twenty-Third District's Child Advocacy Center as a family advocate. As a family advocate, she "met with the families when they [came] in for interviews," which she said was work with the "non-offending caregivers." She received forensic interviewer training in July 2011 and, after the training, she performed both family advocate and forensic interviewer duties. She became employed by the Tennessee Disability Coalition as a "Brain Injury Transition Liaison for Vanderbilt Children's Hospital" from June 2012 until October 2013. She testified that in this position, she "worked with kids that had brain injuries and their families and helped [and] provided resources for them." She said she

was in the emergency room at Vanderbilt Children's Hospital a lot making rounds there, meeting with medical professionals to tell them about our

-16-

program. There would be families there that would be there if a child had a concussion or some kind of brain injury or something like that. I would follow up with those families and then make phone calls to . . . them later to check in and see who they were doing.

On her resume, Ms. Kennedy described her job duties as follows: "Supported children that had sustained brain injuries as they transitioned back into home life and school by educating the families and providing resources as needed." Ms. Kennedy became employed by the Nashville Children's Alliance as a "Forensic Interviewer" in November 2013, a position she still held when she testified at the Defendant's January 2016 trial. In her testimony, she agreed that when she interviewed the victim in January 2014, she "had at least three years of experience working with child protective services and in that type of field."

The Defendant concedes that Ms. Kennedy's employment with the Twenty-Third Judicial District's Child Advocacy Center and the Nashville Children's Alliance provided approximately twenty-two months' relevant experience, but he argues that her employment with the Tennessee Disability Coalition does not qualify as experience in any of the areas specified by Code section 24-7-123(b)(3)(C). With regard to Ms. Kennedy's work at Vanderbilt, the trial court stated:

>    And in terms of Vanderbilt, I mean she is working with them in terms of, according to her testimony, dealing with children who have sustained injuries, educating families, providing resources.
>
>    I'm looking here at the resume. She's testified about that work, which also would entail obviously dealing [with] families and children in a different setting in terms of sex abuse versus physical injuries, but still – and the statute you know you look at this generally. They are talking about child development and training that would apprise one to the point of being a trustworthy interviewer.
>
>    This statute lists child protective services, which Vanderbilt wouldn't qualify for. Criminal justice, that particular program wouldn't. Clinical evaluation could, counseling does. But it says forensic interviewing or other comparable work with children. So is she during her training, her full-time work with Vanderbilt Children's Hospital in the area that she dealt with in terms of interviewing, not from a forensic standpoint, but discussing and talking to children and families that would lead her, aid her to becoming a qualified full-time forensic interviewer in the field of

-17-

counseling or other comparable work with children? I think yes. I mean, it's not like she has been off dealing with veterinarians or something, or some totally unrelated field.

I mean she, since her degree from UT, has been dealing with, training for this particular position that would lead her to be qualified for this particular [position], so I will allow – assuming the child testifies obviously that there [are] no other issues in terms of the [victim] claiming that video isn't accurate, then [the] State would be – and she would have to do that beforehand. So assuming that occurs, then I will allow the State to play that.

The Defendant argues that Ms. Kennedy's employment with the Tennessee Disability Coalition consisted of her working with physicians and parents but not with children. The record reflects, however, that she testified she "worked with kids that had brain injuries and their families and helped [and] provided resources for them" in addition to working with physicians. The trial court found that this employment involved "discussing and talking to children and families." The court found that this employment qualified as relevant experience pursuant to Code section 24-7-123(b)(3)(C)(v) because it was "[f]orensic interviewing or *other comparable work with children*." (Emphasis added.) In making this determination, the court focused on the overriding concern of trustworthiness of the forensic interview and noted that the nature of Ms. Kennedy's job duties with the Tennessee Disability Coalition involved "discussing and talking to children and families that would lead her, aid her to becoming a qualified full-time forensic interviewer in the field of counseling or other comparable work with children." The record supports the trial court's determination in this regard. The Defendant has not shown that the trial court abused its discretion in admitting the victim's forensic interview. The Defendant is not entitled to relief on this basis.

## III

### Admission of Evidence of the Defendant's Pretrial Statement

The Defendant contends that the trial court erred in admitting his recorded pretrial statement without redacting opinion statements by police officers regarding the victim's veracity and the officers' belief that child sexual abuse victims did not fabricate allegations. The State responds that no error occurred because the court instructed the jury twice that it must not consider the statements as substantive evidence. The State counters, as well, that the Defendant has waived appellate consideration of this issue by

arguing a different basis for exclusion of the evidence in this court than he argued in the trial court. We conclude that the trial court did not abuse its discretion.

Considering the State's waiver argument, we note the Defendant's motion in limine relative to this evidence, which sought redaction of portions of the pretrial interview on the basis that "they contain inappropriate speculation and opinion evidence under Tennessee Rule of Evidence 701." Rule 701 pertains to lay witness opinion testimony. On appeal, the defendant has not identified a Rule of Evidence upon which he relies, although he argues that the evidence was inadmissible because it improperly bolstered the victim's credibility. One of the cases to which he cites, *State v. James Thomas, Jr.*, No. M2014-00972-CCA-R3-CD, 2015 WL 4484888, at *5 (Tenn. Crim. App. July 23, 2015), involved the question of whether Tennessee Rule of Evidence 608(a) prohibited a police officer from testifying about the factors he considered in determining whether an alleged rape victim was credible. The Defendant in the present case also cites caselaw relevant to issues involving Rule 701, upon which he relied in the trial court. To the extent that the Defendant's argument pertains to matters addressed by Rule 701, we will consider the issue.

Tennessee Rule of Evidence 701(a) provides:

If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are

(1) rationally based on the perception of the witness and

(2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

The Defendant's complaints pertain to statements by the investigating officers during the recorded interview with the Defendant that the officers knew something had happened because six-year-olds do not fabricate sexual allegations. Before the recording was played, the trial court gave a limiting instruction which included the following:

[T]he tape will contain statements made by law enforcement, by the detectives, . . . but those statements made by the detectives are not admitted for the truth of the matter. In other words, what they're saying is not being admitted for the truth of the matter asserted in those statements.

-19-

They are only, obviously, put into context – those statements put into context any statements that are identified as coming from the defendant . . . . You cannot be speculating to be true any insinuation suggested in a question asked or a statement made by law enforcement. Those law enforcement officers may use various interrogation techniques to elicit responses.

So only the statements that you identify coming from the person identified as the defendant may be considered by you in terms of your determination of whether [the Defendant] is guilty or not guilty; not the statements, and questions, and information provided by . . . law enforcement.

The record reflects that the trial court gave a virtually identical instruction as part of its final jury instructions before the jury began its deliberations. The instruction that the court gave was substantially similar to the proposed instruction the Defendant submitted to the trial court.

Viewed in this context, the officers' statements were not before the jury as substantive evidence. They were not offered as lay opinion evidence regarding the victim's credibility pursuant to Rule 701. The jury was properly advised about how to consider the officers' statements. Jurors are presumed to follow a trial court's limiting instructions. *State v. Butler*, 800 S.W.2d 395, 399 (Tenn. Crim. App. 1994). We conclude that the trial court did not abuse its discretion in admitting the officers' statements for the limited purpose for which the court explained in the jury instructions. The Defendant is not entitled to relief on this basis.

## IV

## State's Rebuttal Argument

The Defendant contends that the trial court erred in permitting the prosecutor to argue in his rebuttal argument that the defense had called only one witness and had not called specific other witnesses. The State contends that the Defendant waived any objection to this argument by failing to make a contemporaneous objection and that, in any event, no error occurred.

The Defendant complains about the following statement during the State's rebuttal argument:

The defendant's focus on Officer Earle's report shows you how desperate the defendant is in this case. Their star and only witness was not the detectives, was not [DCS employee] Tamika Drinnen, it was responding patrol Officer Earle. Responding patrol Officer Earle who does not have any memory of this case, whose job – as he told you – is to make first contact at scenes and turn it over to somebody who specializes in that area if it requires. And in this case it certainly did. He turned it over to a sex abuse detective, then he left, went to more or multiple additional [crime] scenes [and] completed his report four hours after he arrived, three or four hours after he arrived. Their star witness is a man who cannot remember anything about this case and who wrote four sentences about this case.

At the conclusion of the State's rebuttal argument, the defense objected at a bench conference to "burden shifting" in the State's argument "that the defense was desperate, that the defense chose to call only one witness [and] he commented on [the] failure to call Ms. Drennen or the detective." The court stated that the rebuttal argument had been in response to the defense's closing argument.

The record reflects that in his closing argument, defense counsel argued that the victim's mother had testified inconsistently with the statement she gave Officer Earle and that she also failed to provide Officer Earle with information about which she testified. Counsel argued that although Officer Earle might have forgotten to put some information in his report, "he does a good job" and probably would have recorded significant details if the victim's mother had reported them to him.

We begin by considering the State's argument that the Defendant has waived appellate consideration of this issue by failing to make a contemporaneous objection to this portion of the prosecutor's rebuttal argument. The record reflects that the Defendant raised an objection at the end of the State's rebuttal argument and in the motion for a new trial. The requirement that an objection to closing argument be contemporaneous is "to provide the trial court with an opportunity to assess the State's argument and to caution the prosecution and issue a curative instruction to the jury if necessary." *State v. Jordan*, 325 S.W.3d 1, 57-58 (Tenn. 2010). Although the Defendant's first objection occurred at the end of the rebuttal argument, rather than as an interruption immediately when the prosecutor made the argument, we conclude that the Defendant promptly brought the issue to the court's attention and that the court had the opportunity to consider whether curative measures were necessary. The issue was raised in the motion for a new trial, as well. *See* T.R.A.P. 3(e) (requiring that issues regarding alleged misconduct of a counsel be raised in a motion for new trial in order to avoid waiver). Accordingly, appellate consideration of the issue is not waived. *See State v. Deandre*

-21-

*Rucker*, No. M2014-00742-CCA-R3-CD, 2015 WL 4126756, at *5 (Tenn. Crim. App. July 9, 2015) (holding that the defendant did not waive appellate consideration of a prosecutorial misconduct issue, although his objection was made shortly after the specific argument, at the close of the State's rebuttal argument, and he had raised the issue in the motion for a new trial).

Turning to the merits of the Defendant's issue, we note that it is, essentially, a complaint of prosecutorial misconduct during closing argument. Although an exhaustive list of the bounds of prosecutorial impropriety cannot be defined, five general areas of prosecutorial misconduct have been recognized:

1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton*, 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State*, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); Tenn. Code of Prof'l Responsibility DR 7-106(c)(4).

3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See* [*State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998)]; *State v. Stephenson*, 878 S.W.2d 530, 541 (Tenn. 1994).

4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern*, 967 S.W.2d at 737; *State v. Keen*, 926 S.W.2d 727, 736 (Tenn. 1994).

5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

Standards Relating To The Prosecution Function And The Defense Function §§ 5.8–5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971).

*State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

If improper argument occurs, a new trial is required only if the argument affected the outcome of the trial to a defendant's prejudice. *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). In determining whether prosecutorial misconduct affected the jury verdict to prejudice a defendant, this court has stated a court should consider the conduct in light and in context of the facts and circumstances of the case, any curative measures taken by the trial court and the prosecutor, the prosecutor's intent in making the comment, the cumulative effect of the improper comment and any additional errors, the strength or weakness of the case, whether the prosecutor's comments were lengthy and repeated or isolated, and whether the comments were in response to defense counsel's closing argument. *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); *see Goltz*, 111 S.W.3d at 5-6.

The Defendant does not identify any of the areas of prosecutorial misconduct mentioned in *Goltz*. Rather, he argues that he was deprived of his due process right to a fair trial because the prosecutor's argument shifted the burden of proving innocence to the Defendant by commenting on the Defendant's failure to call witnesses. In support of his argument, he cites *State v. Hodge*, 989 S.W.2d 717, 722-23 (Tenn. Crim. App. 1998), as well as cases from other jurisdictions. In *Hodge*, the prosecutor argued that although the defendant called several witnesses who lived in the house where the crime occurred, the defendant failed to call his wife, with whom the other witnesses had assumed he was sleeping at the time the offense occurred. *Hodge*, 989 S.W.2d at 722-23. This court noted that the evidence did not establish facts to support a "missing witness argument," whereby a party is allowed to comment upon a missing witness upon an evidentiary showing that "'the witness had knowledge of material facts, that a relationship exists between the witness and the party that would naturally incline the witness to favor the party, and that the missing witness was available to the process of the Court for the trial.'" *Hodge*, 989 S.W.2d at 722 (quoting *Delk v. State*, 590 S.W.2d 435, 440 (Tenn. 1979)). Although the court gave an instruction that the attorneys were not witnesses and merely presented argument, this court noted that the instruction did not address the central problem with the argument and that the prosecutor continued, after the instruction was given, to comment on the defendant's failure to call his wife as a witness. *Id.* at 723. After the instruction, the prosecutor commented, in pertinent part, "I don't know what she would say, but why didn't he call her, the one who shared the bedroom with this defendant?" *Id.* This court determined that the implication the witness was not called because she would have testified adversely to the defendant was clear, that the argument was improper, and that, when considered in combination with other improper argument, was prejudicial and necessitated a new trial. *Id.* at 723, 725.

In considering the issue in the present case, we have reviewed the entire rebuttal argument in order to consider the complained-of passage in its overall context. We note that the Defendant's closing argument focused, in significant part, on the case resting on the victim's testimony and on the credibility of the victim's mother. The defense's closing argument noted, particularly, inconsistencies and lack of details relevant to the offense in the victim's mother's report to Officer Earle. The prosecutor then responded by outlining the reasons the victim was credible, noting the lack of impeachment of her testimony and the consistency of her testimony with the evidence from the forensic interview. The prosecutor noted the Defendant's post-offense conduct and the portions of his pretrial interview that were consistent with the State's evidence. The prosecutor also argued, as noted above, that the defense attempted to counter the State's proof, which the prosecutor contended was sufficient, by calling Officer Earle as a defense witness, despite his having no independent recollection of having responded to the scene and having taken a report on the night of the offense. The prosecutor went on to argue that the inconsistencies between Officer Earle's report and the victim's mother's testimony were insignificant and an obvious mistake.

Viewed in this overall context, we conclude that the complained-of rebuttal argument is distinguishable from the improper commentary on a defendant's failure to call a witness that occurred in *Hodge*. The State's argument in the present case was offered to rebut the Defendant's argument that Officer Earle's testimony undermined the credibility of the victim's mother, specifically, and the State's case, generally. In making this argument, the prosecutor noted in passing that the defense had not called the detectives or a DCS employee who had been involved in the case and had instead called an officer with only brief involvement in and no memory of the case. Unlike the situation in *Hodge*, the prosecutor in the present case did not argue or suggest that the witnesses the defense had not called were naturally inclined to favor the Defendant and that an adverse inference could be drawn from their failure to testify on his behalf. We do not view the State's rebuttal argument as an improper commentary on the Defendant's failure to call witnesses or as an attempt to shift the burden of proof to the defense. As such, we conclude that the Defendant has not shown a due process deprivation as a result of the State's rebuttal argument. He is not entitled to relief on this basis.

## V

### Cumulative Trial Error

The Defendant contends that due to the existence of multiple errors occurring during the trial, he must receive a new trial based upon the cumulative error doctrine. The concept of cumulative error is that multiple errors, though individually harmless,

cumulatively violate a defendant's right to a fair trial. *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010). Because we have determined that none of the Defendant's allegations of trial error have merit, he is not entitled to relief on the basis of cumulative error.

## VI

## Sentencing

Finally, the Defendant contends that the sentence he received is disproportionate to the offense and constitutes cruel and unusual punishment. Alternatively, he argues that the trial court erred in imposing a sentence greater than the statutory minimum provided for the offense. The State responds that the sentence imposed was not constitutionally excessive and that the trial court did not abuse its discretion in imposing a twenty-six-year sentence. We agree with the State.

## A. **Cruel and Unusual Punishment**

The Defendant contends that Tennessee's mandatory minimum sentence of twenty-five years for the offense of rape of a child constitutes cruel and unusual punishment due to its length, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Tennessee Constitution. He notes that, unlike other Class A felonies which carry a Range I sentence of fifteen to twenty-five years, rape of a child requires that no sentence be less than Range II, which carries a sentence of twenty-five to forty years. *See* T.C.A. § 40-35-112(a)(1) (2014) (prescribing fifteen to twenty-five years for Range I sentences for Class A felonies); *id.* § 40-35-112(b)(1) (prescribing twenty-five to forty years for Range II sentences for Class A felonies); *id.* § 39-13-522(b)(2)(A) (prescribing that for rape of a child, a Class A felony, the sentence imposed shall be no lower than Range II).

The Eighth Amendment to the United States Constitution and Article I, Section 16 of the Tennessee Constitution prohibit, inter alia, "cruel and unusual punishments." Our supreme court has said that the following methodology is appropriate for evaluating the proportionality of a defendant's sentence to his crime:

> [T]he sentence imposed is initially compared with the crime committed. Unless this threshold comparison leads to an inference of gross disproportionality, the inquiry ends – the sentence is constitutional. In those rare cases where this inference does arise, the analysis proceeds by comparing (1) the sentences imposed on other criminals in the same

jurisdiction, and (2) the sentences imposed for commission of the same crime in other jurisdictions.

*State v. Harris*, 844 S.W.2d 601, 603 (Tenn. 1992) (citing *Harmelin v. Michigan*, 501 U.S. 2680, 2702-09 (1991) (Kennedy, J., concurring)).

As the Defendant acknowledges, a panel of this court has rejected a cruel and unusual punishment challenge to the sentencing provision of the rape of a child statute. *See State v. Rhonda Louise Medley*, No. M2009-02446-CCA-R3-CD, 2011 WL 2739512, at *8-10 (Tenn. Crim. App. July 12, 2011), *perm. app. denied* (Tenn. Nov. 16, 2011). The court in *Rhonda Louise Medley* concluded that a mandatory twenty-five-year sentence was not a grossly disproportionate punishment for the crime of rape of a child.[1] *Id.* at *9. Although the wording of the sentencing provision has been changed slightly since the *Rhonda Louise Medley* decision,[2] we are nevertheless compelled by its rationale to conclude that the statutory sentencing scheme providing for a mandatory sentence of at least twenty-five years is not grossly disproportionate, on its face, to the offense of rape of a child. *See id.* Because no gross disproportionality exists, further analysis is not warranted. *See Harris*, 844 S.W.2d at 603. The Defendant is not entitled to relief on this basis.

## B. <u>Length of Sentence</u>

As an alternative to his argument regarding the constitutionality of the sentencing law for rape of a child, the Defendant contends that the trial court erred in imposing a twenty-six-year sentence and that he should have received the minimum sentence of twenty-five years. The State counters that the court did not abuse its discretion. We agree with the State.

At the sentencing hearing, the victim's mother read a prepared statement regarding the effects of the Defendant's conduct on the victim and the victim's family. She stated that the Defendant had been a part of their family. She said the victim had good days and bad days. The victim's mother stated that she was vigilant of the victim's whereabouts at all times and that the victim was no longer able to attend sleepovers with friends. The

---

[1] The court concluded, as well, that the sentencing provision of the rape of a child statute did not violate the defendant's due process rights. *See Rhonda Louise Medley*, 2011 WL 2739512, at *9.

[2] At the time of the offenses in *Rhonda Louise Medley*, the rape of a child statute provided that the sentence could be no less than twenty-five years. *See* T.C.A. § 39-13-522(b)(2)(A) (Supp. 2007) (amended 2011). The statute has since been amended to provide for a sentence that is no lower than Range II. *See* T.C.A. § 39-13-522(b)(2)(A) (2014).

victim's mother stated that the circumstances were unfair to the victim, who was now watchful of strangers and no longer displayed her affections. The victim's mother stated that she forgave the Defendant but noted his failure to accept responsibility for his actions.

The Defendant's grandmother testified that until his conviction, the Defendant had lived with her for six to seven years. She said she had asked him to move into their basement apartment after the Defendant's grandfather became ill and was homebound. She said that she was currently undergoing cancer treatments. She said that although she never asked the Defendant to pay rent, he always left money for her.

The Defendant's grandmother testified that the Defendant was a hard worker and was helpful at home, performing such tasks as cooking breakfast for his grandfather and maintaining the landscaping. She said he always did anything asked of him. She said that without the Defendant's help, she and the Defendant's grandfather would have to hire someone. She said the Defendant was employed full-time as an electrician. She said that had the Defendant been acquitted, the Defendant's employer would have allowed him to return to work. She said that the Defendant had been unable to continue his employment after he was convicted "because of the ankle bracelet and because they did . . . work at different places, hospitals and all of that." She said the Defendant secured alternative employment after his conviction.

The Defendant's grandmother testified that the Defendant's parents had divorced when the Defendant was three years old but that his parents had remained friends in order to raise the Defendant. She said the Defendant had been raised in Christian homes and had been well-mannered and a happy child. She said the Defendant was polite, helpful, gentle, and a "laid-back person," whom she had never known to be mad or curse at another person. She said he was intelligent. She said the Defendant was a good person and appealed to the court for leniency in sentencing the Defendant.

The Defendant's paternal uncle testified that he had seen the Defendant regularly until the Defendant's parents divorced. He said that after the divorce, he continued to see the Defendant at family holiday events. The Defendant's uncle stated that he began seeing the Defendant more frequently after the Defendant moved into the uncle's parents' home. The Defendant's uncle said that during the recession, the Defendant had been unable to find full-time employment but "was still working every job he could find." The Defendant's uncle said the Defendant had been helpful in caring for the Defendant's grandparents, which had benefited the Defendant's uncle because he had been able to travel for a "deployment." The Defendant's uncle had never known the Defendant to be disrespectful and said the Defendant loved to play with the uncle's granddaughter. The

-27-

Defendant's uncle said his father had stated he would miss the Defendant and asked the uncle to express love to the Defendant. The Defendant's uncle acknowledged that the Defendant "might've missed some appointments" and stated that the Defendant had encountered difficulty in finding community service work to perform.

The Defendant's father testified that he and the Defendant's mother divorced when the Defendant was young. The Defendant's father said the Defendant had lived with the Defendant's mother until age twelve or thirteen. The Defendant's father said the Defendant had lived with him until the Defendant's father moved to Florida in 2008. He said the Defendant lived abroad for a time with his mother, stepfather, and brothers before returning to live with the Defendant's father and finishing his education.

The Defendant's father testified that when the Defendant lived with him during the Defendant's teenage years, the Defendant had been respectful, even when they had disagreements about housework, homework, and chores. The Defendant's father said the Defendant had not caused problems. The Defendant's father said he and the Defendant were close and that he was proud of the Defendant. He asked the judge for leniency on the Defendant's behalf.

The presentence report was received as an exhibit and reflects that the then-thirty-one-year-old Defendant had no history of criminal convictions and was a high school graduate. He reported good physical health and no mental disability. He began smoking marijuana daily at age fourteen. He stated that he began using alcohol at age twenty-one, that he drank three times per week, and that he did not commit crimes while intoxicated. The Defendant's employment history included work as an electrician, food service worker, and retail employee. His employment history reflects steady employment from 2006 until 2016.

A status report from Tennessee Recovery and Monitoring was received as an exhibit. It reflected that the Defendant failed to comply with the community service terms of his bond from October 2015 until the date of the report, January 6, 2016. The report also stated that the Defendant had not reported to the agency since November 3, 2015, although the frequency with which the Defendant had been required to report was not stated.

The Defendant's 2004 high school diploma and a Congressional recognition for having graduated from high school were received as an exhibit.

After receiving the proof, the trial court found that the enhancement factor for abuse of private trust applied. T.C.A. § 40-35-114(14) (2014) (amended 2015, 2016,

2017) ("The defendant abused a position of public of private trust, or used a professional license in a manner that significantly facilitated the commission or the fulfillment of the offense[.]"). The court noted that the Defendant had been a close family friend of the victim's uncle who had been in the victim's home almost daily. The court found that the incident occurred by virtue of the close relationship the Defendant had with the victim's family.

Regarding the mitigating evidence, the trial court acknowledged the testimony of the Defendant's family members that the Defendant was a good person but noted that the victim's family members never thought the Defendant would have committed an offense such as he did because they liked him, thought he was a good person, and allowed him in their home around the victim. The court found that the Defendant did not have a prior criminal history and weighed this in the Defendant's favor. *See id.* § 40-35-113(13) (2014) (permitting mitigating evidence to consist of "[a]ny other factor consistent with the purposes of this chapter"). Balancing the enhancement and mitigating factors, the court arrived at the twenty-six-year sentence.

The Defendant argues that the trial court erred in enhancing his sentence on the basis that he abused a position of private trust. *See id.* § 40-35-114(14). He also argues that the trial court erred in failing to apply mitigating weight for his favorable work history and strong family ties. *See id.* § 40-35-113(13).

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the

trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

We begin with the Defendant's argument that the trial court erred in applying the abuse of private trust enhancement factor. The trial court found that the Defendant and the victim's uncle had a close relationship and that the Defendant's frequent presence in the family's home afforded him the opportunity to commit the offense. The victim's mother testified that the Defendant was treated as a family member in the victim's home. The evidence does not preponderate against the trial court's factual determination, and the court did not abuse its discretion in applying this enhancement factor.

The Defendant also complains that the trial court erred by failing to allow mitigating weight for his favorable work history and strong family ties. The record reflects that the Defendant had maintained steady employment throughout his adult life. It likewise reflects that the trial court considered the Defendant's family members' testimony at the sentencing hearing regarding the Defendant's industrious nature and his family relationships. The court noted, though, that the victim's family had viewed the Defendant in similar terms before he committed the offense. Upon review, we conclude that the trial court did not abuse its discretion in declining to apply mitigating weight to the Defendant's productivity and family ties.

The Defendant faced a sentence of twenty-five to forty years. He has not shown that the trial court abused its discretion in enhancing his sentence by one year above the minimum and imposing a twenty-six-year sentence. He is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE